



1  Edward R. Hugo [Bar No. 124839]
   Thomas J. Moses [Bar No. 116002]
2  Jann M. Noddin [Bar No. 196445]
   BRYDON HUGO & PARKER
3  135 Main Street, 20th Floor
   San Francisco, CA 94105
4  Telephone: (415) 808-0300
   Facsimile: (415) 808-0333
5
6  Attorneys for Defendant
   FOSTER WHEELER LLC
7
8
9              UNITED STATES DISTRICT COURT
10            NORTHERN DISTRICT OF CALIFORNIA
11
12 JAMES MAYO,                          (ASBESTOS)
13          Plaintiff(s),               U.S.D.C. _____
                                        Alameda County Superior Court Case No.
14     vs.                              RG-07-357726
15 A.W. SMITH CORPORATION; A.W.
   CHESTERTON COMPANY; ALLIED
16 PACKING & SUPPLY, INC.; ALLIS        DEFENDANT FOSTER WHEELER LLC'S
   CHALMERS CORPORATION               NOTICE OF REMOVAL
17 PRODUCT LIABILITY TRUST;
   AMERICAN STANDARD, INC.
18 INFICIDUALLY AND AS SUCCESSOR
   INTEREST TO KEWANEE BOILER
19 CORPORATION; ARMSTRONG
   INTERNATIONAL, INC.; ASBESTOS
20 CORPORATION, LTD.; BUFFALO
   PUMPS, INC.; CARRIER
21 CORPORATION, INDIVIDUALLY, AS
   SUCCESSOR IN INTEREST AND
22 PARTEN ALTER EGO TO AFFILIATED
   GAS EQUIPMENT, AKA BDP
23 COMPANY AND PAYNE HEATING
   AND COOLING; CLEAVER BROOKS,
24 INDIVIDUALLY AND AS SUCCESSOR-
   IN-INTEREST TO NEBRASKA BOILER;
25 CRANE CO., INDIVIDUALLY AND AS
   SUCCESSOR-IN-INTEREST TO
26 CHAPMAN VALVE CO.; CROWN,
   CORK & SEAL, INDIVIDUALLY AND
27 AS SUCCESSOR-IN-INTEREST TO
   MUNDET CORK; DOOR-OLIVER
28 EIMCO USA, INC., AS SUCCESSOR-IN-
   INTEREST TO KEELER BOILER WORKS;

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

1

1   DURABLA MANURACTURING
    COMPANY; DURAMETALLIC
2   CORPORATION; DURO DYNE
    CORPORATION; FAIRBANKS MORSE
3   PUMP CORP.; FMC CORPORATION;
    FOSTER WHEELER, LLC; GARLOCK
4   SEALING TECHNOLOGIES LLC,
    INDIVIDUALLY AND AS SUCCESSOR-
5   IN-INTEREST TO GARLOCK, INC.;
    GENERAL DYNAMICS
6   CORPORATION, INDIVIDUALLY AND
    AS SUCCESSOR-IN-INTEREST TO
7   NEBRASKA BOILERS; GENERAL
    ELECTRIC COMPANY; GOULDS
8   PUMPS, INCORPORATED; IMO
    INDUSTRIES, INC., FORMERLY
9   KNOWN AS IMO DELAVAL INC.;
    INGERSOLL-RAND COMPANY; LESLIE
10  CONTROLS, INC.; J.T. THORPE & SON,
    INC.; ITT INDUSTRIES, INC.,
11  INDIVIDUALLY AND AS SUCCESSOR-
    IN-INTEREST TO ALLIS CHALMERS,
12  CORP. AND BELL AND GOSSETT;
    OAKFABCO, INC., INDIVIDUALLY
13  AND AS SUCCESSOR-IN-INTEREST TO
    AND/OR FKA AND/OR FDBA
14  KEWANEE BOILER CORPORATION;
    OWENS-ILLINOIS INC.; PALOMA
15  INDUSTRIES, INC., INDIVIDUALLY
    AND AS SUCCESSOR-IN-INTEREST TO
16  RUUD; PARKER-HANNIFIN
    CORPORATION, INDIVIDUALLY AND
17  AS SUCCESSOR-IN-INTEREST TO
    SACOMO SIERRA AND SACOMO
18  MANUFACTURING COMPANY; RAY
    OIL BURNER CO.; SEPCO
19  CORPORATION; STERLING FLUID
    SYSTEMS (USA) LLC, FORMERLY
20  KNOWN AS PEERLESS PUMP
    COMPANY; THE GOODYEAR TIRE &
21  RUBBER COMPANY; YARWAY
    CORPORATION; VIACOM,
22  INCORPORATED AS SUCCESSOR-BY-
    MERGER TO CBS CORPORATION FKA
23  WESTINGHOUSE ELECTRIC
    CORPORATION AND THE FIRST DOE
24  THROUGH THREE HUNDREDTH DOE,
    INCLUSIVE,
25
              Defendants.
26

27  TO THE HONORABLE JUDGE OF UNITED STATES DISTRICT COURT:

28          Pursuant to Title 28 U.S.C. § 1442(a)(1) and 1446, Defendant Foster Wheeler, LLC

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

                                    2

("Foster Wheeler"), gives notice of removal of an action filed against it in the Superior Court of the State of California, County of Alameda, to the United States District Court for the Northern District of California. In support, Foster Wheeler respectfully offers the following:

**Preliminary Matters**

1.    On or about November 21, 2007, plaintiff filed this lawsuit, entitled James Mayo, Case No. RG07357726 against Foster Wheeler and numerous other defendants in the Superior Court of the State of California, Alameda County. *See* Summons and Complaint attached hereto as Exhibit A.

2.    Plaintiff served Foster Wheeler with plaintiff's Summons and Complaint on November 30, 2007. The Complaint did not state plaintiff's claims in a manner or in sufficient detail to inform defendants that the case was removable. *See Madden v. Able Supply Co.*, 205 F. Supp. 2d 695, 698 (S.D. Tex. 2002) (stating that if the initial pleading does not provide details of plaintiff's claims, the 30-day time period begins on the date defendant receives "other paper" specifically indicating grounds for removal). Plaintiff did not forward Answers to Interrogatories ("Answers") until December 24, 2007. *See* Answer attached hereto as Exhibit B. Plaintiff's Answers include allegations that plaintiff James Mayo was injured as a result of exposure to asbestos while serving in the United States Navy and aboard Navy ships. *Id.* More specifically, there are allegations of exposure while working as a boiler technician on the USS Castor from 1950 to 1955. *Id.* at Exhibit B.

3.    Thus, this Notice of Removal is timely filed in that it is filed within thirty (30) days after the first receipt by Foster Wheeler of plaintiff's "other papers" from which it ascertained that this case is removable. 28 U.S.C. § 1446(b).

**Nature Of The Case**

4.    The case is based on plaintiff's allegations that James Mayo's asbestos-related disease, specifically mesothelioma, was caused by his exposure to asbestos dust and/or fibers.

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

3

DEFENDANT FOSTER WHEELER LLC'S NOTICE OF REMOVAL

5.      Plaintiff asserts failure to warn claims along with strict liability and negligence claims against Foster Wheeler and the other defendants based on various theories.

**Grounds For Removal**

6.      This Notice of Removal is filed within thirty (30) days of plaintiff's service of "other paper." 28 U.S.C. § 1446(b). Foster Wheeler manufactured marine boilers and auxiliary equipment for use on Navy ships pursuant to contracts and specifications executed by the Navy. Foster Wheeler has confirmed that its boilers were on the USS Castor. The basis for removal is that, in the manufacture and sale of boilers and economizers for the Navy, including all aspects of warnings associated with that equipment, Foster Wheeler was acting under an officer or agency of the United States within the meaning of 28 U.S.C. § 1442(a)(1).

7.      Should plaintiff file a motion to remand this case, Foster Wheeler respectfully requests an opportunity to respond more fully in writing, but offers the following authorities at this time:

8.      As recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504 (1988), Foster Wheeler has a federal defense to this action, *i.e.*, government contractor immunity from liability for injuries arising from any exposure to asbestos related to boilers and auxiliary equipment on board Navy vessels, insofar as they were constructed or repaired by Foster Wheeler. Removal pursuant to 28 U.S.C. § 1442(a)(1) is appropriate where the moving party can (1) demonstrate that it acted under the direction of a federal officer, (2) raise a colorable federal defense to plaintiffs' claims, and (3) demonstrate a causal nexus between plaintiff's claims and acts it performed under color of federal office. *Mesa v. California*, 489 U.S. 121, 124-25, 129-31, 134-35 (1989).

9.      One New York Federal Court has reviewed this issue as recently as February 2004.  In *Isaacson v. Dow Chemical Company*, 304 F.Supp.2d 442 (E.D.N.Y. 2004), plaintiff originally sued the manufacturer of Agent Orange in New Jersey State Court. Defendants removed to federal court asserting, among other things, federal jurisdiction

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

4

DEFENDANT FOSTER WHEELER LLC'S NOTICE OF REMOVAL

1  under the All Writs Act. *Id.* at 445. The New Jersey District Court found removal
2  appropriate under the All Writs Act. *Id.* The case was then transferred to the Eastern
3  District of New York by the Multidistrict Panel. *Id.* The Court of Appeals for the Second
4  Circuit affirmed the district court's denial of remand finding jurisdiction appropriate
5  under the All Writs Act. *Stephenson v. Dow Chemical Company*, 273 F.3d 19 (2d Cir. 2003).
6  On review, the United States Supreme Court remanded the case finding that the All
7  Writs Act alone would not support removal. *Dow Chemical Company v. Stephenson*, 539
8  U.S. 111 (2003). On remand from the Supreme Court, the Second Circuit determined that
9  jurisdiction could not be grounded in the All Writs Act and remanded the case back to
10  the Eastern District of New York to determine if there was an alternative ground
11  supporting federal jurisdiction. *Stephenson v. Dow Chemical Company*, 346 F.3d 19 (2d Cir.
12  2003). It is with that extensive procedural history that the district court examined the
13  federal officer removal statute and found it sufficient to deny plaintiff's motion to
14  remand. *Isaacson*, 304 F.Supp. at 445.

15      10.    In reaching its conclusion, the *Isaacson* court discussed in detail the three
16  elements necessary for removal under this statute. First, a defendant must demonstrate
17  that it is a "person" within the meaning of the statute. *Id.* at 446. The definition of a
18  "person" includes a corporation. *Id.* Second, the defendant must establish that the suit is
19  "for any act under color of federal office," i.e., there is a causal connection between the
20  charged conduct and asserted official authority. *Id.* (citations omitted). Causation exists
21  if the predicate acts of the state court suit were undertaken while the person was acting
22  as or under a federal officer, and the acts were under color of the relevant federal office.
23  *Id.* Third, defendants must raise a colorable claim to a federal law defense. *Id.* As
24  previously stated, a colorable claim to a federal defense can be predicated upon the
25  federal government contractor defense. *Id.* at 449.

26      11.    The second element requires a causal nexus between the defendant's
27  actions under the federal officer and plaintiff's state court claims. *Id.* at 447. A substantial
28  degree of direct and detailed federal control over defendant's work is required. *Id.* What

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

5

DEFENDANT FOSTER WHEELER LLC'S NOTICE OF REMOVAL

1   constitutes sufficient federal control is often central to a court's decision to uphold

2   removal or remand a case.  Several courts have upheld removal because defendants were

3   sued as a result of building products pursuant to military specifications. *See Crocker v.*

4   *Borden*, 852 F.Supp. 1322 (E.D.La. 1994)(holding that removal was proper for

5   Westinghouse because its marine turbines were manufactured pursuant to Navy

6   specifications); *see also, Pack v. AC and S, Inc.*, 838 F.Supp. 1099 (D.Md. 1993)(holding that

7   removal was proper for Westinghouse because the government had extensive control

8   over the manufacture of turbines, even specifying the type of asbestos cloth).  Not all

9   courts agree, however, on the amount of federal control necessary to uphold removal

10  under this statute.

11          12.     Certain courts have not always viewed this issue consistently.  Prior to the

12  *Isaacson* case, the Eastern District Court of New York remanded a similar matter

13  involving Agent Orange.  In *Ryan v. Dow Chemical Company*, 781 F.Supp. 934, 950

14  (E.D.N.Y. 1992), the district court remanded the case because it found that the control by

15  the government was not sufficient to meet the requirements of section 1442(a)(1).  The

16  district court reasoned that the government sought only to buy a ready-to-order

17  herbicide from the defendant and did not cause or control the production of the

18  unwanted byproduct, dioxin, which was the alleged cause of the injuries. *Id.*

19          13.     In discussing *Ryan*, the *Isaacson* court acknowledged that it was a

20  contradictory decision. *Isaacson*, 304 F.Supp. at 445.  It declared, however, that the *Ryan*

21  decision was "no longer persuasive" and went on to discuss Fifth Circuit cases that

22  specifically rejected the *Ryan* conclusion. *See Winters v. Diamond Shamrock Chemical Co.*,

23  149 F.3d 387, 392 (5th Cir. 1998)(holding that manufacturer of Agent Orange was entitled

24  to removal pursuant to the federal officer removal statute); *see also, Miller v. Dow Chemical*

25  *Company*, 275 F.3d 414, 417 (5th Cir. 2001)(also holding that manufacturer of Agent

26  Orange was entitled to removal pursuant to the federal officer removal statute).  The

27  *Isaacson* court denied remand based on facts that were almost identical to those in *Ryan*.

28  The *Isaacson* court concluded that the government ordered specifications differed from

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

6

DEFENDANT FOSTER WHEELER LLC'S NOTICE OF REMOVAL

1   the specifications for the defendants' commercial application of the product. *Isaacson,*

2   *supra* at 450. In addition, the method of warning and application was completely in the

3   government's hands. *Id.* Finally, the government had full knowledge of the dioxin

4   "problem" inherent in the production of Agent Orange. *Id.* These factors demonstrated

5   the control with which the government operated and, thus, warranted a different holding

6   than *Ryan*. *Id.*

7       14.    This analysis also applies to "failure to warn" cases where "there is

8   evidence that the government was involved in the decision to give, or not to give, a

9   warning." *Kerstetter v. Pacific Scientific Co.*, 210 F.3d 431, 438 (5th Cir.) *cert. denied* 531 U.S.

10  919 (2000). The Court of Appeals for the Fifth Circuit has made it clear that the

11  government contractor defense is available in "failure to warn" claims where the evidence

12  shows that the lack of a warning reflects governmental direction or control rather than

13  the unfettered discretion of the product's manufacturer, and applies wherever: 1) the

14  government approved or authorized the warnings which the plaintiff contends were

15  inadequate or incomplete; 2) the warnings provided by the manufacturer conformed to

16  the warnings as approved or authorized by the government; and 3) the manufacturer

17  warned the government as to any product hazards known by the manufacturer but

18  unknown by the government. *Kerstetter*, 210 F.3d at 438.

19      15.    As stressed in *Kerstetter*, "[t]he government need not prepare the

20  specifications to be considered to have approved them." *Id.* at 435. The only material issue

21  is whether the manufacturer's designs and specifications were subjected to "substantial

22  review" rather than a mere "rubber stamp" approval. *Id.* While this determination is

23  necessarily fact specific, "substantial review" has plainly been shown upon evidence of a

24  "'continuous back and forth' between the contractor and the government." *Id.* In this

25  regard, "[t]he specifications need not address the specific defect alleged; the government

26  need only evaluate the design feature in question." *Id.* Once again, applying these general

27  principles to "failure to warn" claims, the fact that governmental specifications or

28  regulations did not specifically preclude the exact warning desired by the plaintiff does

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

7

DEFENDANT FOSTER WHEELER LLC'S NOTICE OF REMOVAL

1  not take a "failure to warn" claim outside the scope of the government contractor defense

2  so long as the government was involved generally as to the issue of product warnings (or

3  specifically approved the warnings provided by the contractor) and was generally aware

4  of the hazard in question. *Id.* at 438. Stated another way, "[i]nadequacy [of a warning] is

5  not an issue when it is the government's warning in the first place." *Id.* at 438.

6       16.    The present case is substantially similar to *Kerstetter, supra.* As explained

7  by J. Thomas Schroppe:

> The Navy exercised intense direction and control over all written
> documentation to be delivered with its naval boilers...The Navy required
> that every piece of equipment be supplied with a defined number of copies
> of one or more technical manuals. Navy personnel participated intimately
> in the preparation of this kind of information and exercised specific
> direction and control over its contents. These manuals included safety
> information related to the operation of naval boilers and economizers only
> to the extent directed by the Navy.
>
> Furthermore, the Navy had precise specifications, practices and procedures
> that governed the content of any communication affixed to machinery
> supplied by Foster Wheeler to the Navy. Foster Wheeler would not be
> permitted, under the specifications, associated regulations and procedures,
> and especially under actual practice as it evolved in the field, to affix any
> type of warning or caution statement to a piece of equipment intended for
> installation onto a Navy vessel, beyond those required by the Navy.

17  *See* Affidavit of J. Thomas Schroppe attached hereto as Exhibit B at ¶¶ 21 and 22. Thus,

18  the presence or absence of warnings regarding Foster Wheeler equipment was strictly

19  controlled by the Navy - and a clear basis for removal exists under § 1442(a)(1).

20       17.    In further support of the removal, Foster Wheeler provides the Affidavit of

21  Admiral Ben J. Lehman, U.S. Navy, Ret. *See* Affidavit of Admiral Lehman attached

22  hereto as Exhibit C. Admiral Lehman joined the Navy in 1942 and worked as Ship

23  Superintendent and Planning Officer at the Brooklyn Navy Yard between 1942 and 1944,

24  as Ship Superintendent at the San Francisco Naval Shipyard from 1950 to 1952, and as

25  Planning Officer at the Assistant Industrial Manager Office in San Francisco from 1952 to

26  1054. *Id.* at ¶ 1. During his tenure in the Navy and as Ship Superintendent, Admiral

27  Lehman was personally involved with the supervision and oversight of ship alterations

28  and equipment over hauls at the Brooklyn Navy Yard. *Id.* at ¶ 3. Admiral Lehman states

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

8

DEFENDANT FOSTER WHEELER LLC'S NOTICE OF REMOVAL

1 in his Affidavit the Navy controlled every aspect of the design and manufacture of

2 equipment intended for installation on Navy vessels and that the Navy could not, and

3 did not, permit its contractors to implement changes from military specifications. *Id.* at

4 ¶¶ 2 and 3.  He further states:

5      The U.S. Navy would not have allowed its equipment suppliers, such as
     Foster Wheeler, to affix any warning related to any asbestos hazards on

6      their equipment.  This would have included boilers.  Further, the U.S.
     Navy would not have allowed Foster Wheeler to place any warnings

7      related to asbestos hazards in any written material provided by Foster
     Wheeler to the U.S. Navy or to a U.S. Navy contractor in accordance with

8      its contracts, including its technical and operations manuals.  To do so
     would have interfered with the U.S. Navy's mission and control of its

9      ships and personnel.

10 *Id.* at ¶ 14.

11 Clearly, the Schroppe and Lehman Affidavits support federal removal jurisdiction under

12 28 U.S.C. § 1442(a)(1) and the federal nexus to Foster Wheeler's actions has been

13 established.

14        18.    In further support of the removal, Foster Wheeler provides the Declaration

15 of Lawrence Stillwell Betts.  *See* Affidavit of Lawrence Stillwell Betts ("Betts decl."),

16 attached hereto as Exhibit D.  Dr. Betts is a medical doctor and retired Navy captain who

17 holds a Ph.D. in occupational health and is board certified in occupational medicine and

18 industrial hygiene.  According to Dr. Betts' declaration, Foster Wheeler manufactured

19 and delivered boilers and auxiliary equipment to the Navy pursuant to government

20 contracts, some of which may or may not have ended up on this ship.  However, any

21 such boiler and auxiliary equipment manufactured and supplied by Foster Wheeler in

22 fulfillment of government contracts followed exact specifications set forth by the United

23 States Government detailing the performance requirements of such equipment and the

24 materials, including the particular insulation to be used.  The U.S. Navy would have

25 accepted delivery of such boilers and auxiliary equipment only if it met their exact

26 specifications.  *Id.* at ¶ 4.  According to Dr. Betts, since the 1920s, the Navy has had state-

27 of-the art knowledge concerning potential health hazards of asbestos and would not have

28 allowed a manufacturer to unilaterally deviate from Navy specifications by including

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

9

DEFENDANT FOSTER WHEELER LLC'S NOTICE OF REMOVAL

1   warning labels on equipment or on any materials that were supplied to the Navy. *Id.* at ¶

2   9.

3        19.    According to Dr. Betts, among the requirements imposed on private

4   contractors by the Navy was the use of asbestos-containing materials in the

5   maintenance and repair of naval vessels. This requirement reflected the state of the art

6   at the time, as well as the demands and requirements of combat ready Navy vessels.

7   The Navy also issued specifications as to the nature and content of all written materials

8   that were delivered with each piece of equipment and materials, and determined the

9   hazards to be subject to precautionary labeling and the contents of such labeling.

10  Further the Navy determined the nature of any oral warnings that were to be given

11  about the use of the products and materials aboard its ships. In short, according to

12  Admiral Lehman and Dr. Betts, the Navy dictated ever aspect of the design,

13  manufacture, installation, overhaul, written documentation and warnings associated

14  with its ships, and did not permit deviations from any of its contractors, including

15  Foster Wheeler. (Lehman decl., at ¶¶ 3-6, 14.; Betts decl. at ¶¶ 33, 34.) The U.S. Navy

16  would not have allowed its equipment suppliers, such as Foster Wheeler, to affix any

17  warnings related to any asbestos hazards on their equipment, including its boilers or in

18  their technical and operations manuals. To do so would have interfered with the U.S.

19  Navy's mission and control of its ships and personnel. (Lehman decl. at ¶ 14; Betts decl.

20  at ¶¶ 33, 34.)

21       20.    Beginning in the 1930s, the U.S. Navy conducted extensive research

22  concerning the hazard of exposure to asbestos. In the early 1940s, the Navy's Bureau of

23  Medicine and Surgery, in coordination with U.S. Maritime Commission, set standards

24  based on the report of Dr. Philip Drinker, then Chief Health Consultant for the United

25  States Maritime Commission, (Betts decl. at ¶ 18.) as well as studies conducted by

26  Fleischer, Viles, Gade, and Drinker, called the "Fleischer-Drinker study." (*Id.* at ¶ 18.)

27  Based on these various studies, the Navy adopted a recommended "maximum

28  allowable concentration (M.A.C.)" value for asbestos of 5 MPPCF. (*Id.* at ¶ 19.) The

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

10

DEFENDANT FOSTER WHEELER LLC'S NOTICE OF REMOVAL

1  U.S. Navy made a conscious and informed decision about how asbestos would be used
2  on its ships and how exposures would be controlled, if at all, on its ships. (Lehman decl.
3  at ¶ 13.)

4        21.      As Dr. Betts attests, the Navy had superior knowledge of the dangers of
5  asbestos prior to and during the time that Foster Wheeler provided "military
6  equipment," and would not have allowed any warnings to be affixed to its equipment.

7        Dr. Betts states in his declaration:

8    a.    The information possessed by the Navy with respect to the specification
          and use of asbestos, and the health hazards associated with each of its uses
9          aboard Navy vessels, represented the state-of-the-art and far exceeded any
          information that possibly could have been provided by a boiler
10         manufacturer, like Foster Wheeler. Based upon the state of knowledge at
          given period in time, that Navy was fully aware of the recognized health
11         hazards of asbestos and had a robust program to control exposure of
          personnel and monitor their health.

12   b.    There was no information concerning any asbestos containing hazards, or
          danger posed by any asbestos-containing material used in boiler and
13         auxiliary equipment supplied under Navy material specifications on a
          United States Navy ship which was known to a boiler and auxiliary
14         equipment manufacturer, like Foster Wheeler that was not known to the
          United States government and the United States Navy.
15

16   c.    It would be unreasonable to assume that the Navy would have accepted
          gratuitous, "non-expert" comments from manufacturers and vendors about
17         hazards associated with a product – especially for one about which the
          Navy was already fully aware and much more knowledgeable than the
18         manufacturer or vendor. (Betts decl. ¶ 36.)

19  Clearly, the Schroppe, Lehman and Betts affidavits support federal removal jurisdiction
20  under 28 U.S.C. § 1442(a)(1) and the federal nexus to Foster Wheeler's actions has been
21  established.

22        22.      A properly removed case cannot be remanded for discretionary or policy
23  reasons such as allegedly related state court cases or a contention that judicial economy
24  compels remand. 28 U.S.C. § 1447(c); *Thermitron Products, Inc. v. Hermansdorfer*, 423 U.S.
25  336 (1976). The federal officer removal statute is not narrow or limited, and it should not
26  be frustrated by a narrow or grudging interpretation of § 1442(a)(1). *Willingham v.*
27  *Morgan*, 395 U.S. 402, 405 (1960).

28        23.      Foster Wheeler is not required to notify and obtain the consent of any other

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

11

DEFENDANT FOSTER WHEELER LLC'S NOTICE OF REMOVAL

1  defendant in this action in order to remove plaintiffs' action as a whole under

2  § 1442(a)(1).  *See Torres v. CBS News*, 854 F. Supp. 245 (S.D.N.Y. 1994).

3      24.    As required by 28 U.S.C. § 1446(b) and the local rules of this Court, true and

4  correct copies of the process and pleadings served upon Foster Wheeler are being filed

5  with this Notice of Removal.

6                          **Conclusion**

7      25.    Removal of this action is proper under 28 U.S.C. § 1442, because it is a civil

8  action brought in a state court, and the federal district courts have original jurisdiction

9  over the subject matter under 28 U.S.C. § 1442(a)(1) because Foster Wheeler was acting

10  under an officer or agency of the United States.

11     THEREFORE, Foster Wheeler, pursuant to these statutes and in conformance with

12  the requirements set forth in 28 U.S.C. § 1446, removes this action for trial from the

13  Superior Court of the State of California, Alameda County, on this 4th day of January,

14  2008.

15                                  Respectfully submitted,

16

17                          By:    _____
                                   Edward R. Hugo
18                                 Thomas J. Moses
                                   Jann M. Noddin
19                                 Attorneys for Defendant
                                   FOSTER WHEELER LLC
20
                                   4801-1780
21

22

23

24

25

26

27

28

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

12

DEFENDANT FOSTER WHEELER LLC'S NOTICE OF REMOVAL

# EXHIBIT A

# SUMMONS
## *(CITACION JUDICIAL)*

**SUM-100**

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
A. O. SMITH CORPORATION;
[SEE ATTACHMENT FOR ADDITIONAL DEFENDANTS]

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**ENDORSED**
**FILED**
**ALAMEDA COUNTY**

NOV 2 1 2007

CLERK OF THE SUPERIOR COURT
By _____
E. BAKER                    Deputy

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
JAMES MAYO

You have **30 CALENDAR DAYS** after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no presenta puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
1225 FALLON ST.

OAKLAND, CA 94612

**CASE NUMBER:**
*(Número de Caso):*
**07357726**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
JEFFREY A. KAISER  (SBN 160594)    (415) 646-7160    415-981-1270
LEVIN SIMES KAISER & GORNICK, LLP
44 MONTGOMERY STREET, 36TH FLOOR
SAN FRANCISCO, CA 94104

DATE:
*(Fecha)* NOV 2 1 2007    Pat S. Sweeten
Clerk, by _____, Deputy
*(Secretario)*    *(Adjunto)*

Executive Officer/Clerk of the Superior Court
E. BAKER

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*
3. [X] on behalf of *(specify):*  **FOSTER WHEELER, LLC**
   under: [X] CCP 416.10 (corporation)      [ ] CCP 416.60 (minor)
          [ ] CCP 416.20 (defunct corporation)  [ ] CCP 416.70 (conservatee)
          [ ] CCP 416.40 (association or partnership)  [ ] CCP 416.90 (authorized person)
          [ ] other *(specify):*
4. [ ] by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Legal
Solutions
Plus

Code of Civil Procedure §§ 412.20, 465

12/7/07
# 10008706

1   Attachment to Summons

2

3   JAMES MAYO,                                          )   No.
                                                         )
4              PLAINTIFF,                                 )
                                                         )
5              VS.                                        )
                                                         )
6   A. O. SMITH CORPORATION;                             )
    A. W. CHESTERTON COMPANY;                            )
7   ALLIED PACKING & SUPPLY, INC.;                       )
    ALLIS CHALMERS CORPORATION PRODUCT                   )
8   LIABILITY TRUST;                                     )
    AMERICAN STANDARD, INC. INDIVIDUALLY AND             )
9   AS SUCCESSOR INTEREST TO KEWANEE BOILER              )
    CORPORATION;                                         )
10  ARMSTRONG INTERNATIONAL, INC.;                       )
    ASBESTOS CORPORATION, LTD.;                          )
11  BUFFALO PUMPS, INC.;                                 )
    CARRIER CORPORATION, INDIVIDUALLY, AS                )
12  SUCCESSOR IN INTEREST AND PARENT ALTER               )
    EGO TO AFFILIATED GAS EQUIPMENT, AKA BDP             )
13  COMPANY AND PAYNE HEATING AND COOLING;               )
    CLEAVER BROOKS, INDIVIDUALLY AND AS                  )
14  SUCCESSOR-IN-INTEREST TO NEBRASKA BOILER;            )
    CRANE CO., INDIVIDUALLY AND AS SUCCESSOR-            )
15  IN-INTEREST TO CHAPMAN VALVE CO.;                    )
    CROWN, CORK & SEAL, INDIVIDUALLY AND AS              )
16  SUCCESSOR-IN-INTEREST TO MUNDET CORK;                )
    DORR-OLIVER EIMCO USA, INC AS SUCCESSOR-IN-          )
17  INTEREST TO KEELER BOILER WORKS;                     )
    DURABLA MANUFACTURING COMPANY;                       )
18  DURAMETALLIC CORPORATION;                            )
    DURO DYNE CORPORATION;                               )
19  FAIRBANKS MORSE PUMP CORP.;                          )
    FMC CORPORATION;                                     )
20  FOSTER WHEELER, LLC;                                 )
    GARLOCK SEALING TECHNOLOGIES LLC,                    )
21  INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST            )
    TO GARLOCK, INC.;                                    )
22  GENERAL DYNAMICS CORPORATION,                        )
    INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST            )
23  TO NEBRASKA BOILERS;                                 )
    GENERAL ELECTRIC COMPANY;                            )
24  GOULDS PUMPS, INCORPORATED;                          )
    IMO INDUSTRIES, INC. FORMERLY KNOWN AS               )
25  IMO DELAVAL INC.;                                    )

26

27

28

1   INGERSOLL-RAND COMPANY;                                     )
    LESLIE CONTROLS, INC.;                                      )
2   J. T. THORPE & SON, INC.;                                   )
    ITT INDUSTRIES, INC., INDIVIDUALLY AND AS                   )
3   SUCCESSOR-IN-INTEREST TO ALLIS CHALMERS,                    )
    CORP. AND BELL AND GOSSETT;                                 )
4   OAKFABCO, INC INDIVIDUALLY AND AS                           )
    SUCCESSOR-IN-INTEREST TO AND/OR FKA                         )
5   AND/OR FDBA KEWANEE BOILER CORPORATION;                     )
6   OWENS-ILLINOIS INC.;                                        )
    PALOMA INDUSTRIES, INC. INDIVIDUALLY AND AS                 )
7   SUCCESSOR-IN-INTEREST TO RUUD;                              )
    PARKER-HANNIFIN CORPORATION,                                )
8   INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST                   )
9   TO SACOMO SIERRA AND SACOMO                                 )
    MANUFACTURING COMPANY;                                      )
10  RAY OIL BURNER CO.;                                         )
11  SEPCO CORPORATION;                                          )
    STERLING FLUID SYSTEMS (USA) LLC, FORMERLY                  )
12  KNOWN AS PEERLESS PUMP COMPANY;                             )
    THE GOODYEAR TIRE & RUBBER COMPANY;                         )
13  YARWAY CORPORATION;                                         )
14  VIACOM, INCORPORATED AS SUCCESSOR-BY-                       )
    MERGER TO CBS CORPORATION FKA                               )
15  WESTINGHOUSE ELECTRIC CORPORATION                           )
    AND THE FIRST DOE THROUGH THREE                             )
16  HUNDREDTH DOE, INCLUSIVE,                                   )
                                                                )
17              DEFENDANTS.                                     )
                                                                )

18

19

20

21

22

23

24

25

26

27

28

1  JEFFREY A. KAISER, ESQ. [SBN 160594]
   ANNA M. COSTA, ESQ. [SBN 203741]
2  **LEVIN SIMES KAISER & GORNICK LLP**
   44 MONTGOMERY STREET, 36TH FLOOR
3  SAN FRANCISCO, CALIFORNIA 94104
   TELEPHONE (415) 646-7160
4  FACSIMILE (415) 981-1270

5  ATTORNEYS FOR PLAINTIFF
   JAMES MAYO
6

**ENDORSED**
**FILED**
**ALAMEDA COUNTY**

NOV 21 2007

CLERK OF THE SUPERIOR COURT
By E. BAKER
Deputy

                    SUPERIOR COURT OF CALIFORNIA
7                        COUNTY OF ALAMEDA
                       (UNLIMITED JURISDICTION)

8
   JAMES MAYO,                                    )    No.
9                                                 )    **07357726**
                    PLAINTIFF,                    )
10                                                )    **COMPLAINT FOR**
                    VS.                           )    **DAMAGES**
11                                                )
   A. O. SMITH CORPORATION;                       )    NEGLIGENCE,
12  A. W. CHESTERTON COMPANY;                     )    STRICT LIABILITY,
   ALLIED PACKING & SUPPLY, INC.;                 )    PUNITIVE DAMAGES,
13  ALLIS CHALMERS CORPORATION PRODUCT            )
   LIABILITY TRUST;                               )    (ASBESTOS)
14  AMERICAN STANDARD, INC. INDIVIDUALLY AND      )
   AS SUCCESSOR INTEREST TO KEWANEE BOILER        )
15  CORPORATION;                                  )
   ARMSTRONG INTERNATIONAL, INC.;                 )
16  ASBESTOS CORPORATION, LTD.;                   )
   BUFFALO PUMPS, INC.;                           )
17  CARRIER CORPORATION, INDIVIDUALLY, AS         )
18  SUCCESSOR IN INTEREST AND PARENT ALTER        )
   EGO TO AFFILIATED GAS EQUIPMENT, AKA BDP       )
19  COMPANY AND PAYNE HEATING AND COOLING;        )
   CLEAVER BROOKS, INDIVIDUALLY AND AS            )
20  SUCCESSOR-IN-INTEREST TO NEBRASKA BOILER;     )
   CRANE CO., INDIVIDUALLY AND AS SUCCESSOR-      )
21  IN-INTEREST TO CHAPMAN VALVE CO.;             )
   CROWN, CORK & SEAL, INDIVIDUALLY AND AS        )
22  SUCCESSOR-IN-INTEREST TO MUNDET CORK;         )
23  DORR-OLIVER EIMCO USA, INC AS SUCCESSOR-IN-   )
   INTEREST TO KEELER BOILER WORKS;               )
24  DURABLA MANUFACTURING COMPANY;                )
   DURAMETALLIC CORPORATION;                      )
25  DURO DYNE CORPORATION;                        )
26  FAIRBANKS MORSE PUMP CORP.;                   )
   FMC CORPORATION;                               )
27  FOSTER WHEELER, LLC;                          )
28  GARLOCK SEALING TECHNOLOGIES LLC,             )
   INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST      )

1   TO GARLOCK, INC.;                                             )
    GENERAL DYNAMICS CORPORATION,                                 )
2   INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST                     )
    TO NEBRASKA BOILERS;                                          )
3   GENERAL ELECTRIC COMPANY;                                     )
    GOULDS PUMPS, INCORPORATED;                                   )
4   IMO INDUSTRIES, INC. FORMERLY KNOWN AS                        )
    IMO DELAVAL INC.;                                             )
5   INGERSOLL-RAND COMPANY;                                       )
    LESLIE CONTROLS, INC.;                                        )
6   J. T. THORPE & SON, INC.;                                     )
    ITT INDUSTRIES, INC., INDIVIDUALLY AND AS                     )
7   SUCCESSOR-IN-INTEREST TO ALLIS CHALMERS,                      )
    CORP. AND BELL AND GOSSETT;                                   )
8   OAKFABCO, INC INDIVIDUALLY AND AS                             )
    SUCCESSOR-IN-INTEREST TO AND/OR FKA                           )
9   AND/OR FDBA KEWANEE BOILER CORPORATION;                       )
    OWENS-ILLINOIS INC.;                                          )
10  PALOMA INDUSTRIES, INC. INDIVIDUALLY AND AS                   )
    SUCCESSOR-IN-INTEREST TO RUUD;                                )
11  PARKER-HANNIFIN CORPORATION,                                  )
    INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST                     )
12  TO SACOMO SIERRA AND SACOMO                                   )
    MANUFACTURING COMPANY;                                        )
13  RAY OIL BURNER CO.;                                           )
    SEPCO CORPORATION;                                            )
14  STERLING FLUID SYSTEMS (USA) LLC, FORMERLY                    )
    KNOWN AS PEERLESS PUMP COMPANY;                               )
15  THE GOODYEAR TIRE & RUBBER COMPANY;                           )
    YARWAY CORPORATION;                                           )
16  VIACOM, INCORPORATED AS SUCCESSOR-BY-                         )
    MERGER TO CBS CORPORATION FKA                                 )
17  WESTINGHOUSE ELECTRIC CORPORATION                             )
    AND THE FIRST DOE THROUGH THREE                               )
18  HUNDREDTH DOE, INCLUSIVE,                                     )
                                                                  )
19              DEFENDANTS.                                       )

20

21

22

23

24                          **GENERAL ALLEGATIONS**

25          1.    The true names and capacities, whether individual, corporate, associate,

26  governmental or otherwise, of defendants FIRST DOE through THREE HUNDREDTH DOE,

27  inclusive, are unknown to Plaintiff at this time, who therefore sues said defendants by such

28  fictitious names.  When the true names and capacities of said defendants have been ascertained,

I:\2100.MAYO\COMPLAINT\ALAMEDA.COMPLAINT.PLSINGLE.ASB.BOILER.DOC

1   Plaintiff will amend this complaint accordingly.  Plaintiff is informed and believes, and thereon

2   alleges, that each defendant designated herein as a DOE is responsible, negligently or in some

3   other actionable manner, for the events and happenings hereinafter referred to, and caused injuries

4   and damages proximately thereby to the Plaintiff, as hereinafter alleged.

5        2.      At all times herein mentioned, each of the defendants, except as otherwise alleged,

6   was the agent, servant, employee and/or joint venturer of her co-defendants, and each of them, and

7   at all said times, each defendant was acting in the full course and scope of said agency, service,

8   employment and/or joint venture. Plaintiff does not allege that Asbestos Corporation Ltd. was the

9   agent, servant, employee and/or joint venturer of any entity during any of the years Asbestos

10  Corporation Ltd. was owned by any governmental agency. Certain defendants agreed and

11  conspired among themselves, and with certain other individuals and/or entities, to act, or not to

12  act, in such a manner that resulted in injury to the Plaintiff, JAMES MAYO; and such defendants,

13  as co-conspirators, are liable for the acts, or failures to act, of other conspiring defendants. Plaintiff

14  does not allege that Asbestos Corporation Ltd. conspired with any entity during any of the years

15  Asbestos Corporation Ltd. was owned by any governmental agency.

16       3.      Plaintiff is informed and believes, and thereon alleges, that at all times herein

17  mentioned, defendants **A. O. SMITH CORPORATION;  A. W. CHESTERTON COMPANY;**

18  **ALLIED PACKING & SUPPLY, INC.;  ALLIS CHALMERS CORPORATION PRODUCT**

19  **LIABILITY TRUST;  AMERICAN STANDARD, INC. INDIVIDUALLY AND AS**

20  **SUCCESSOR INTEREST TO KEWANEE BOILER CORPORATION;  ARMSTRONG**

21  **INTERNATIONAL, INC.;  ASBESTOS CORPORATION, LTD.;  BUFFALO PUMPS,**

22  **INC.;  CARRIER CORPORATION, INDIVIDUALLY, AS SUCCESSOR IN INTEREST**

23  **AND PARENT ALTER EGO TO AFFILIATED GAS EQUIPMENT, AKA BDP**

24  **COMPANY AND PAYNE HEATING AND COOLING;  CLEAVER BROOKS,**

25  **INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO NEBRASKA BOILER;**

I:\2100.MAYO\COMPLAINT\ALAMEDA.COMPLAINT.PLSINGLE.ASB.BOILER.DOC

1  CRANE CO., INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO CHAPMAN

2  VALVE CO.; CROWN, CORK & SEAL, INDIVIDUALLY AND AS SUCCESSOR-IN-

3  INTEREST TO MUNDET CORK; DORR-OLIVER EIMCO USA, INC AS SUCCESSOR-

4  IN-INTEREST TO KEELER BOILER WORKS; DURABLA MANUFACTURING

5  COMPANY;  DURAMETALLIC CORPORATION; DURO DYNE CORPORATION;

6  FAIRBANKS MORSE PUMP CORP.;  FMC CORPORATION;  FOSTER WHEELER,

7  LLC;  GARLOCK SEALING TECHNOLOGIES LLC, INDIVIDUALLY AND AS

8  SUCCESSOR-IN-INTEREST TO GARLOCK, INC.;  GENERAL DYNAMICS

9  CORPORATION, INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO

10  NEBRASKA BOILERS;  GENERAL ELECTRIC COMPANY; GOULDS PUMPS,

11  INCORPORATED;  IMO INDUSTRIES, INC. FORMERLY KNOWN AS IMO DELAVAL

12  INC.;  INGERSOLL-RAND COMPANY; LESLIE CONTROLS, INC.;  J. T. THORPE &

13  SON, INC.;  ITT INDUSTRIES, INC., INDIVIDUALLY AND AS SUCCESSOR-IN-

14  INTEREST TO ALLIS CHALMERS, CORP. AND BELL AND GOSSETT;  OAKFABCO,

15  INC INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO AND/OR FKA AND/OR

16  FDBA KEWANEE BOILER CORPORATION; OWENS-ILLINOIS INC.;  PALOMA

17  INDUSTRIES, INC. INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO RUUD;

18  PARKER-HANNIFIN CORPORATION, INDIVIDUALLY AND AS SUCCESSOR-IN-

19  INTEREST TO SACOMO SIERRA AND SACOMO MANUFACTURING COMPANY;

20  RAY OIL BURNER CO.;  SEPCO CORPORATION;  STERLING FLUID SYSTEMS

21  (USA) LLC, FORMERLY KNOWN AS PEERLESS PUMP COMPANY;  THE

22  GOODYEAR TIRE & RUBBER COMPANY; YARWAY CORPORATION;  VIACOM,

23  INCORPORATED AS SUCCESSOR-BY-MERGER TO CBS CORPORATION FKA

24  WESTINGHOUSE ELECTRIC CORPORATION AND THE FIRST DOE THROUGH

25  THREE HUNDREDTH DOE, inclusive, inclusive, are corporations organized and existing

26

27

28

I:\2100.MAYO\COMPLAINT\ALAMEDA.COMPLAINT.PLSINGLE.ASB.BOILER.DOC

1    under and by virtue of the laws of the State of California, or the laws of some state or foreign

2    jurisdiction, and that said defendants were and are authorized to do and are doing business in the

3    State of California, and that said defendants have regularly conducted business in the County of

4    Alameda, State of California.  The defendants identified in this paragraph are collectively

5    hereinafter referred to as "ASBESTOS DEFENDANTS."

6

7         4.    At all times herein mentioned, each of the **ASBESTOS DEFENDANTS** was the

8    successor, successor in business, successor in product line or a portion thereof, parent, subsidiary,

9    wholly or partially owned by, or the whole or partial owner of or member in an entity researching,

10   studying, manufacturers, fabricating, designing, labeling, assembling, distributing, leasing, buying,

11   offering for sale, selling, inspecting, servicing, installing, contracting for installation, repairing,

12   marketing, warranting, rebranding, handling, modifying, scraping, disturbing, manufacturing for

13   others, packaging and/or advertising a certain substance the generic name for which is asbestos,

14   and other products containing said substance.  Said entities shall hereinafter collectively be called

15   "alternate entities".  Each of the herein named **ASBESTOS DEFENDANTS** are liable for the

16   tortous conduct of each successor, successor in business, successor in product line or a portion

17   thereof,  assign, predecessor, predecessor in business, predecessor in product line or a portion

18   thereof, parent, subsidiary, alter-ego, whole of partial owner, or wholly or partially owned entity,

19   or entity that it as a member of, or funded, that researched, studied, manufactured, fabricated,

20   designed, labeled, assembled, distributed, leased, bought, offered for sale, sold, inspected,

21   serviced, installed, contracted for installation, repaired, marketed, warranted, rebranded,

22   manufactured for others and advertised a certain substance, the generic name of which is asbestos,

23   and other products containing said substance.  The following **ASBESTOS DEFENDANTS**, and

24   each of them, are liable for the acts of each and every "alternate entity", and each of them, in that

25   there has been a virtual destruction of Plaintiff remedy against each such "alternate entity";

26   **ASBESTOS DEFENDANTS**, and each of them, have acquired the assets, product line, or

27

28

I:\2100.MAYO\COMPLAINT\ALAMEDA.COMPLAINT.PI.SINGLE.ASB.BOILER.DOC

apportion thereof, of each such "alternate entity"; **ASBESTOS DEFENDANTS**, and each of them, caused the destruction of Plaintiff remedy against each such "alternate entity"; each such **ASBESTOS DEFENDANTS** has the ability to assume the risk-spreading role of each such "alternate entity"; and that each such **ASBESTOS DEFENDANTS** enjoys the goodwill originally attached to each such "alternate entity".

| DEFENDANT | ALTERNATE ENTITY |
| --- | --- |
| AMERICAN STANDARD, INC. | KEWANEE BOILER CORPORATION |
| CARRIER CORPORATION | AFFILIATED GAS EQUIPMENT, AKA BDP COMPANY AND PAYNE HEATING AND COOLING |
| CLEAVER BROOKS | NEBRASKA BOILER |
| CRANE CO. | CHAPMAN VALVE CO. |
| CROWN, CORK & SEAL | MUNDET CORK |
| DORR-OLIVER EIMCO USA, INC | KEELER BOILER WORKS |
| GARLOCK SEALING TECHNOLOGIES LLC | GARLOCK, INC. |
| GENERAL DYNAMICS CORPORATION | NEBRASKA BOILERS |
| IMO INDUSTRIES, INC. | IMO DELAVAL INC. |
| ITT INDUSTRIES, INC. | ALLIS CHALMERS, CORP. AND BELL AND GOSSETT |
| OAKFABCO, INC | KEWANEE BOILER CORPORATION |
| PALOMA INDUSTRIES, INC. | RUUD |
| PARKER-HANNIFIN CORPORATION | SACOMO SIERRA AND SACOMO MANUFACTURING COMPANY |
| STERLING FLUID SYSTEMS (USA) LLC | PEERLESS PUMP COMPANY |
| VIACOM, INCORPORATED | CBS CORPORATION FKA WESTINGHOUSE ELECTRIC CORPORATION |

I:\2100.MAYO\COMPLAINT\ALAMEDA.COMPLAINT.PI.SINGLE.ASB.BOILER.DOC

**FIRST CAUSE OF ACTION-NEGLIGENCE**

<u>(Personal Injuries)</u>

PLAINTIFF JAMES MAYO COMPLAINS OF DEFENDANTS AND EACH OF THEM
AND FOR A CAUSE OF ACTION FOR NEGLIGENCE (PERSONAL INJURIES) ALLEGES:

5.      Plaintiff realleges and incorporates herein by reference each of the proceeding
paragraphs of this Complaint.

6.      Plaintiff, JAMES MAYO, alleges exposure  to asbestos fibers while a member of
the United States Navy from 1950 to 1955 aboard Navy vessels, in San Francisco and Alameda
county; while a member of the United States Air Force from 1955 to 1976 at various locations;
and while working at V.A. hospitals in Johnson, TN and Wala Wala, Wa.  Plaintiff alleges
exposure to asbestos from his work with and around asbestos, asbestos products, materials and/or
equipment mined, made, distributed, assembled, designed, sold, supplied, re-branded, disturbed,
handled, installed, controlled, supervised and/or removed by defendants herein at the
aforementioned sites.  Venue is proper in Alameda County, Superior Court of California.

7.      At all times herein mentioned, the **ASBESTOS DEFENDANTS** and each of them
were engaged in the business of manufacturing, fabricating, designing, assembling, distributing,
leasing, buying, selling, inspecting, servicing, repairing, distributing, modifying, handling,
installing, contracting to install, removing, contracting to remove, disturbing, cutting, grinding,
scraping, marketing, warranting and/or advertising a certain substance, the generic name of which
is asbestos, and/or other products containing said substance, or are engaged in the business of
manufacturing, fabricating, designing, assembling, distributing, selling, and marketing of safety
equipment, including respiratory protective devices which were intended to block the entry of
asbestos fibers into the bodies of workers who were exposed to asbestos in the workplace and
other locations.

8.  At all times herein mentioned, the **ASBESTOS DEFENDANTS,** and each of them,

I:\2100.MAYO\COMPLAINT\ALAMEDA.COMPLAINT.PI.SINGLE.ASB.BOILER.DOC

singularly and jointly, negligently and carelessly researched, tested or failed to test, warned or

failed to warn, manufactured and/or caused to be manufactured, designed, developed, distributed,

supplied, removed, abated, tore out, drilled, dug out, threw away, discarded, swept up, labeled,

advertised, marketed, warranted, inspected, repaired, installed, scraped, cut, ground, distributed,

handled, fabricated, assembled, modified, serviced, and/or sold a certain substance, the generic

name of which is asbestos, and/or other products containing said substance, and said substance

was capable of causing and did, in fact, proximately cause personal injuries to users, consumers,

workers and others, while being used in a manner reasonably foreseeable, thereby rendering said

substances unsafe and dangerous for use by the consumers, users, bystanders or workers exposed

thereto.

9.     At all times herein mentioned, the ASBESTOS DEFENDANTS, and each of them

manufactured, distributed, sold and/or designed products to be used with asbestos, and/or other

products containing said substance. Each ASBESTOS DEFENDANT manufactured, distributed,

sold and/or designed products in such a manner that it required the regular replacement of asbestos

and/or other materials containing asbestos. Moreover, each ASBESTOS DEFENDANT

defectively designed, sold, manufactured and/or distributed products which caused the degradation

of integrated asbestos-containing products, which contributed to plaintiff's development of

mesothelioma. This being so, even despite the fact that alternative feasible designs were available

that would not cause degradation and release of asbestos fibers from the original and replacements

asbestos materials to the same extent as the design chosen by ASBESTOS DEFENDANTS.

10.   It was foreseeable to each ASBESTOS DEFENDANT that the original asbestos and

other materials containing asbestos would be removed and replaced with new asbestos and/or

other materials containing asbestos during ordinary operation and maintenance. Indeed, during the

time period in question, most if not all, replacement materials were comprised of asbestos. The

operation, use and repair of each of the ASBESTOS DEFENDANTS products would affect both

the original and replacement asbestos and other products containing asbestos by making them brittle, friable and not reusable. It was foreseeable to each ASBESTOS DEFENDANT that the process of removing asbestos materials incorporated into their products and replacing them with new asbestos materials during ordinary repair and maintenance would disturb asbestos and result in the release of asbestos fibers into the air, thereby exposing Plaintiff, other workers and bystanders. EACH ASBESTOS DEFENDANT failed to warn Plaintiff, other workers and bystanders of the risks inherent in the replacement of asbestos containing parts and failed to warn Plaintiff, other workers and bystanders that their product was designed to make asbestos friable.

11.    Plaintiff herein is a worker who for or during a substantial length of time used, handled or has been otherwise exposed to the asbestos and asbestos products referred to herein in a manner that was reasonably foreseeable.

12.    As a direct and proximate result of the conduct of the **ASBESTOS DEFENDANTS**, and each of them, as aforesaid, the exposure to asbestos caused severe and permanent malignant injuries to the Plaintiff, including, but not limited to, mesothelioma and other lung damage.

13.    Plaintiff is informed and believes, and thereon alleges, that mesothelioma is a progressive lung disease caused by inhalation of asbestos fibers without perceptible trauma and that said disease results from exposure to asbestos and asbestos products over a period of time.

14.    Plaintiff presently believes that he suffers from a medical condition known as mesothelioma, a lung disease related to the exposure to asbestos. Plaintiff was not aware that exposure to asbestos presented any risk of injury and/or disease to him, and had not been advised or informed by anyone that he could contract any disease, sickness or injury as a result of working in the vicinity of asbestos.

15.    As a direct and proximate result of the aforesaid conduct of **ASBESTOS DEFENDANTS**, and each of them, Plaintiff is dying and has suffered, and continues to suffer

permanent non-malignant injuries to his person, body and health, including but not limited to mesothelioma, other lung damage, all to his general damages in a sum invoking the unlimited jurisdiction of the Court.

16.    As a direct and proximate result of the aforesaid conduct of the **ASBESTOS DEFENDANTS**, and each of them, Plaintiff has incurred, is presently incurring and will incur in the future, liability for physicians, surgeons, nurses, hospital care, medicine, hospitals, x-rays and other medical treatment, the true and exact amount thereof being unknown to Plaintiff at this time, and Plaintiff prays leave to amend this Complaint accordingly when the true and exact cost thereof is ascertained.

17.    Plaintiff JAMES MAYO has lost pre-judgment interest pursuant to Civil Code Section 3288, the exact amount of which Plaintiff prays leave to insert herein when finally ascertained.

18.    In researching, testing, manufacturing, distributing, labeling, and marketing said products, **ASBESTOS DEFENDANTS** in this cause of action named, and each of them, did so with conscious disregard for the safety of the users of said products, in that **ASBESTOS DEFENDANTS** had specific prior knowledge that there was a high risk of injury or death resulting from exposure to asbestos or asbestos products, including but not limited to mesothelioma.  Said knowledge was obtained, in part, from scientific studies, government data, and medical data to which **ASBESTOS DEFENDANTS** had access, as well as scientific studies performed by, at the request of, or with the assistance of, said **ASBESTOS DEFENDANTS**, and which knowledge was obtained by said **ASBESTOS DEFENDANTS** on or before 1933, and thereafter.

19.    On or before 1933, and thereafter, said **ASBESTOS DEFENDANTS** were aware that users of asbestos and asbestos products, as well as members of the general public who would be exposed to asbestos and asbestos products, had no knowledge or information indicating that

asbestos could cause injury, and said **ASBESTOS DEFENDANTS** knew that the users of asbestos and asbestos products, as well as members of the general public who were exposed to asbestos and asbestos products, would assume, and in fact did assume, that exposure to asbestos and asbestos products was safe, when in fact said exposure was extremely hazardous to human life.

20.     With said knowledge, said **ASBESTOS DEFENDANTS** opted to manufacture and distribute said asbestos and asbestos products without attempting to protect users from or warn users of, the high risk of injury or death resulting from exposure to asbestos and asbestos products. Rather than attempting to protect users and workers from, or warn workers and users of, the high risk of injury or death resulting from exposure to asbestos and asbestos products, **ASBESTOS DEFENDANTS** intentionally failed to reveal their knowledge of said risk, fraudulently, consciously and actively concealed and suppressed said knowledge from members of the general public that asbestos and asbestos products were unsafe for all reasonably foreseeable use, with the knowledge of the falsity of said implied representations.

21.     The above referenced conduct of said **ASBESTOS DEFENDANTS** was motivated by the financial interest of said **ASBESTOS DEFENDANTS** in the continuing, uninterrupted distribution and marketing of asbestos and asbestos products. In pursuance of said financial motivation, said **ASBESTOS DEFENDANTS** consciously disregarded the safety of the users of, and persons exposed to, asbestos and asbestos products, and were in fact, consciously willing to permit asbestos and asbestos products to cause injury to workers and users thereof, and persons exposed thereto, including Plaintiff.

22.     As the above referenced conduct of said **ASBESTOS DEFENDANTS** was and is vile, base, willful, malicious, fraudulent, oppressive, outrageous, and in conscious disregard and indifference to the safety and health of workers exposed to asbestos and asbestos products, including Plaintiff, Plaintiff, for the sake of example, and by way of punishing said **ASBESTOS**

1    **DEFENDANTS**, seeks punitive damages according to proof.

2        WHEREFORE, Plaintiff prays judgment against **ASBESTOS DEFENDANTS**, and each

3    of them, as hereafter set forth.

4        ### SECOND CAUSE OF ACTION - STRICT LIABILITY

5        AS AND FOR A SECOND, SEPARATE, FURTHER AND DISTINCT CAUSE OF

6    ACTION FOR STRICT LIABILITY, PLAINTIFF COMPLAINS OF THE **ASBESTOS**

7

8    **DEFENDANTS** AND EACH OF THEM, AND ALLEGES AS FOLLOWS:

9        23.    Plaintiff realleges and incorporates herein by reference each of the proceeding

10   paragraphs of this Complaint.

11       24.    **ASBESTOS DEFENDANTS** and each of them, researched, manufactured, tested

12   or failed to test, warned or failed to warn, designed, labeled, distributed, advertised, marketed,

13

14   warranted, distributed, handled, installed, modified, scraped, inspected, repaired, offered for sale

15   and sold a certain substance, the generic name of which is asbestos and other products containing

16   said substance, which substance is defective, in that same was capable of causing and did, in fact,

17   cause personal injuries, including mesothelioma and other lung damage, to the users and

18   consumers thereof while being used in a reasonably foreseeable manner, thereby rendering the

19   same unsafe and dangerous for use by consumers, users, bystanders and workers exposed thereto;

20   said **ASBESTOS DEFENDANTS**, and each of them, further failed to adequately warn of the

21

22   risks to which Plaintiff and others similarly situated were exposed.

23       25.    At all times herein mentioned, the **ASBESTOS DEFENDANTS**, and each of them

24   were aware that the original gaskets and packing supplied with their equipment would need to be

25   removed and replaced with new gaskets and packing during ordinary operation and maintenance of

26   their equipment.  Heat and pressure generated by operation would affect the original and

27

28   replacement gaskets and packing – e.g., making them brittle, friable and not reusable, making

     replacement necessary and dangerous.  It was foreseeable that the process of removing old gaskets

     I:\2100.MAYO\COMPLAINT\ALAMEDA.COMPLAINT.PI.SINGLE.ASB.BOILER.DOC

and packing, and replacing them with the new materials during ordinary maintenance operations would disturb the asbestos materials, releasing asbestos into the air.

26. As a direct and proximate result thereof, Plaintiff has suffered the injuries and damages as previously set forth including those alleged in the First and Second Causes of Action, inclusive.

WHEREFORE, Plaintiff JAMES MAYO prays judgment against **ASBESTOS DEFENDANTS**, and each of them, as follows:

1. For Plaintiff's general damages according to proof;

2. For Plaintiff JAMES MAYO'S medical and related expenses according to proof;

3. For Plaintiff's prejudgment interest according to proof, pursuant to Civil Code section 3288;

4. For loss of income according to proof;

5. For Plaintiff's costs of suit herein;

6. As to those **ASBESTOS DEFENDANTS** named in the First Cause of Action, for exemplary or punitive damages according to proof; and

7. For such other and further relief as this Court deems just and proper.


DATED:   November 21, 2007

LEVIN SIMES KAISER & GORNICK, LLP

By:   _____
ANNA MARIA COSTA
Attorney for Plaintiff
JAMES MAYO

# EXHIBIT B

**AFFIDAVIT OF J. THOMAS SCHROPPE IN SUPPORT OF FOSTER
WHEELER'S NOTICE OF REMOVAL**

I, J. Thomas Schroppe, being under penalty of perjury, declare and say:

1.      I am a 1962 graduate of the New York State Maritime College with a degree in
Marine Engineering. For three months in 1962, I worked as a Third Assistant Engineer for
American Export Lines. I began my career at Foster Wheeler in 1962 as a Proposal Engineer
in the Marine Department. As a Proposal Engineer, I was responsible for taking shipyard
specifications and designing a boiler to meet the thermal performance and physical
requirements of those specifications. In 1967, I became the Manager of the Proposal
Department and reviewed all proposals. In 1969, I was promoted to Vice President of
Engineering at which point I supervised both proposal and contract execution activities.
From 1975 to 1982, I was President of Foster Wheeler Boiler Corporation. In 1982, I
became Managing Director of Foster Wheeler U.K. From 1984 to my retirement in 1999, I
was Executive Vice President of Foster Wheeler Power Systems.

2.      I am personally familiar with the degree of supervision and control exercised by the
Navy and its agencies in procurement contracts with Foster Wheeler for boilers and auxiliary
equipment because I was personally involved in such contracts at all the various stages of
development, from inquiry and bid through production, testing, and sea trials and, ultimately,
acceptance.

3.      I submit this affidavit to attest to the degree of involvement, supervision, direction and
control exercised by the U.S. Navy and its authorized agents and officers in connection with
procurement contracts with Foster Wheeler for equipment to be installed aboard U.S. Naval
vessels. The following paragraphs describe the contract process from the perspective of Foster
Wheeler as the vendor, as well as the levels of interaction between Foster Wheeler and the
Navy agents and personnel through the various stages of a given contract.

4.      Foster Wheeler furnished and fabricated marine propulsion boilers and related auxiliary
systems for U.S. Navy, Maritime Commission, and Coast Guard ships under contract between
Foster Wheeler and the shipyards and/or the United States Navy Department and its authorized
agencies, officers and personnel (hereafter collectively referred to as the "Navy").

5.      The Navy was responsible for all phases of the design of a vessel, which was
accomplished by the Naval architect. Specifically, the Naval architect would prepare the ship
design which involved the entire vessel, including the machinery space, and all performance
requirements. In general, the ship design for any given class of ship would be contained in a
Ship Specification ("Ship Spec") which covers all aspects of the vessel including the machinery space.
As it relates to the boiler, the Ship Spec would cover all boiler operating criteria, performance
requirements, and maximum physical dimension of the boiler(s). In general, the Ship Spec was
written and prepared by the naval architect and approved by the Navy and, in the course of its
projects with the Navy, Foster Wheeler was required to design, fabricate and furnish equipment
which complied strictly with the requirements in the Ship Spec.

6.      In addition to the Ship Spec, Foster Wheeler was also obligated to comply with Military
Specifications ("Mil Specs") which cover all specific components of the boiler, including

accessories, subcomponents, and materials required to fabricate the boilers and its components.

7.    The normal process by which Foster Wheeler sold marine boilers and economizers to the Navy first involved receipt and response to an inquiry from either BuShips (Bureau of Ships) or the shipyard, depending on the Navy's procurement process. The boiler inquiry would be assigned to a proposal engineer at Foster Wheeler's marine department who would review the inquiry, which consisted of the Ship Spec and the associated drawings, for the performance requirements and size limitations of the boiler.

8.    The performance requirements are contained in the specifications, namely MIL-B18381 and the Ship Spec, which must be followed. I must point out that deviations from these specs were not acceptable as the boiler is just one piece of the entire power plant which was designed by BuShips or by a designated naval architecture firm such as Gibbs and Cox. In addition, the Foster Wheeler proposal engineer was aware that these requirements would be tested during the sea trials, so all calculations had to precisely conform with the Ship Spec.

9.    During the proposal phase, Foster Wheeler would prepare design drawings and related materials in conformance with the Ship Spec (which included performance specs and size limitations) and other requirements contained in MIL-B-18381 which was the Mil Spec pertaining to Naval propulsion boilers. I am personally familiar with the MIL-B-18381 as I saw it and referred to it throughout my career at Foster Wheeler. Foster Wheeler would prepare a proposal drawing and proposal specification that would outline the design and scope of material and equipment contained in the proposal. The boiler proposal submitted by Foster Wheeler would incorporate the specific requirements set forth in the Ship Spec and MIL-B18381.

10.    Approximately half way through the proposal process, information is forwarded to Foster Wheeler's estimating department to start to prepare an estimate of the boiler cost. In parallel, the proposal engineer starts calling vendors to obtain quotes for the various boiler accessories such as burners, sootblowers, gage glasses, safety valves, etc. All Navy approved vendors were asked to provide a quotation for the material in accordance with the Mil Spec covering their equipment or product.

11.    The finished boiler proposal consisted of an approximately 25 page booklet, a proposal drawing and an offering letter to the entity requesting a proposal so stating that the offering was in accordance with the Ship Spec and all required Mil Specs.

12.    The boiler proposal would be reviewed by the shipyard with the understanding that the proposed design, prepared specifically for the Navy in accordance with the Ship Spec. at issue, conformed to all appropriate specifications stated above. Once final price negotiations were complete, the contract was awarded to Foster Wheeler.

13.    The boiler specifications would provide detailed requirements for the boiler and economizer and would always reference the boiler Mil Spec (MIL-B-18381) which dictated very specific material requirements such as:

(a)    Boiler, superheater and economizer tubes: Type of tube, tube diameter, tube thickness, material, and tensile strength.

(b)    Refractory and Insulation: Specification identified the material, arrangement of various bricks and insulating materials on various boiler walls and provided specific Mil Specs for each type of insulating/refractory material.

(c)    Boiler accessories: All accessories applied to the boiler, such as burners, safety valves, soot blowers, must conform to a specific Navy Mil Spec for each such component.

14.    At receipt of an order the same Foster Wheeler proposal engineer is assigned the project as a contract engineer which will entail a more detailed recalculation of the thermal performance for the boiler. In addition, calculations of all the pressure drops, design of drum de-superheaters and final selection of all boiler accessories are made. All this work will be double checked by the head of engineering. In parallel, the contract engineer will commence discussions with the contract design department who will make all the drawings required for both manufacture, for submission to the shipyard and the Navy for review and approval. Foster Wheeler would not commence production of the boilers until the Navy issued final approval of these contract drawings. The approved drawings prepared during this phase would eventually be incorporated into the technical manuals.

15.    The contract design department also provides the material requisitions to the purchasing department so they may procure materials in accordance with Mil Specs. With regard to procurement of insulating and refractory material, the specific requirements for insulation and refractory items are listed in MIL-B-18381, which then references additional Mil Specs for each specific type of refractory/insulating material required. Foster Wheeler's procurement process would involve the purchasing department contacting the vendor and requesting a quotation for the material. The Foster Wheeler purchase order would reference the appropriate Mil Spec for each item shipped. The vendor, in turn, would supply materials that conformed to the Mil Spec and ship it directly to the shipyard. Finished products such as burners, sootblowers, and all refractory and insulating materials, etc. are shipped direct to the shipyard so they may be incorporated into the final boiler erection. Upon arrival at the shipyard, there would be a receipt inspection to ensure what was on bill of materials was delivered.

16.    During manufacture of the boiler, a Navy resident inspector was present at Foster Wheeler's shops. The Navy inspector would review all fabrication processes, welding procedures, pressure part welding, and all weld x-rays for conformity to Mil Specs. The inspector would also ensure that all materials used at this stage, e.g., steel, flanges, tubes, etc., conformed to applicable Mil Specs. All manufacturing was performed to drawings which had been reviewed and approved by the Navy.

17.   Once individual components (e.g., headers, tubes, pressure parts) were manufactured, inspected by a Foster Wheeler quality control inspector, and inspected and stamped with approval by the resident Navy inspector, the materials/components were moved to the shipping area. At this point, the boiler fabrication was complete, though the boilers were in a "knocked down" condition (unassembled) for shipment. The economizers were always shop assembled since they could be shipped by rail. The boiler components and related materials were wrapped and/or boxed in accordance with Mil Specs relating to packaging and shipment of materials, which is also referred to in Mil Spec MIL-B-18381.

18.   The knocked down boilers are then shipped from Foster Wheeler's facility to the shipyard for assembly. For those not familiar with Naval propulsion boilers, they are simply too large and heavy to be shipped assembled. The assembly is done by shipyard workers with a Foster Wheeler employee on site to interpret drawings and answer questions that may arise during the assembly process. Resident Navy inspectors also witness the boiler assembly process.

19.   A critically important inspection item is the hydrostatic test put on the boiler after complete assembly of the pressure parts. This test is a water pressure test of the boiler at 50% over the boiler design pressure. At this point, leaks, even small ones, are not acceptable to the Navy. Formal written acceptance at this stage by the Navy inspector is a requirement. The boilers now sit idle in the ship as the remainder of the engine room and the balance of the ship are being completed. It is at this point that all the engine room piping is connected to the various connections on the boiler. Following the piping tests (shipyard responsibility) the shipyard insulates all piping up to the boiler casings.

20.   Upon completion of the vessel by the shipbuilder, dock trials start to test the various machinery systems in the engine room. The boilers are run at low power since the main turbine cannot be run very fast at the dock because any higher powers would tear the ship loose from the pier. Full power testing is done during sea trials where all aspects of the boiler performance are thoroughly tested. Foster Wheeler would send a service engineer to witness these tests and answer any questions which may arise. Foster Wheeler frequently sent the contract engineer on the first ship of a new class to obtain first-hand data on the boiler performance. Sea Trials were performed on every ship and formal approval by the head Navy inspector was required. Any punch list items which were identified had to be corrected before final acceptance of the boilers.

21.   In addition to the above design, manufacture and testing there remains an obligation by Foster Wheeler to provide technical manuals for the boilers and economizers furnished in a given Navy contract. The Navy exercised intense direction and control over all written documentation to be delivered with its naval boilers such as engineering drawings, test reports and other technical data that could be used as needed by shipboard engineering officer during the life of the equipment. The Navy required that every piece of equipment be supplied with a defined number of copies of one or more technical manuals. Navy personnel participated intimately in the preparation of this kind of information and exercised specific direction and control over its contents. These manuals included safety information related to the operation of naval boilers and economizers only to the extent

directed by the Navy.

22.     Furthermore, the Navy had precise specifications, practices and procedures that governed the content of any communication affixed to machinery supplied by Foster Wheeler to the Navy.  Foster Wheeler would not be permitted, under the specifications, associated regulations and procedures, and especially under actual practice as it evolved in the field, to affix any type of warning or caution statement to a piece of equipment intended for installation onto a Navy vessel, beyond those required by the Navy.

        I declare under the penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct. Executed this 27 day of March, 2007 at Newark, New Jersey.

                                                J. Thomas Schroppe

THE STATE OF NEW JERSEY

ESSEX COUNTY                    )

        Personally appeared before me this        day of March, 2007, J. Thomas Schroppe, who made oath that the statements contained in the affidavit above are true and correct to the best of his knowledge.

        Subscribed and sworn to before me this 27ᵃʰ day of March, 2007. My

    commission expires    4/1/2007

                                        Notary Public
                                HEDWIG BACHLER
                                A NOTARY PUBLIC OF NEW JERSEY
                                MY COMMISSION EXPIRES APRIL 1, 2007

# EXHIBIT C

**AFFIDAVIT OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RETIRED
IN SUPPORT OF FOSTER WHEELER'S NOTICE OF REMOVAL**

I, Ben J. Lehman, understanding and being under the penalty of perjury, declare:

1.      I am a Rear Admiral, Retired, of the United States Navy [U.S. Navy]. I received

notice of my commission as an Ensign in April, 1942 and commenced active duty in the U.S.

Navy on June 1, 1942. Immediately prior to commencing active duty in the U.S. Navy, I

attended the College of the City of New York. I had been a "student engineer" at the Mack

Manufacturing Co. [Mack Trucks] in Allentown, PA and had been enrolled as a special student at

Lehigh University, Bethlehem, PA from June 1941 until January 1942. I returned to the College

of the City of New York in order to complete my course work there and then enter military

service. I had already completed two years of U.S. Army ROTC. On entering active duty, the U.S.

Navy ordered me to study naval architecture and marine Engineering at the Massachusetts Institute

of Technology [MIT]. Later, I was ordered to the U.S. Naval Academy Post-Graduate School at

Annapolis [now the U.S. Navy Post-Graduate School in Monterey, CA]. I received a Master of

Science [SM] from Harvard University in 1949. I studied Design Philosophy and Advanced Stress

Analysis at Stanford University in 1957 and 1958. In the U.S. Navy, I served as a Ship

Superintendent and Dry Docking Officer at the New York Naval Shipyard [formerly the

Brooklyn Navy Yard], between 1942 and 1944, as a Ship Superintendent at the San Francisco

Naval Shipyard from September 1950 to May 1952, and as a Planning Officer at the Assistant

Industrial Manager, San Francisco from 1952 to 1954. In the Navy, I have always been an

Engineering Duty Officer. I was promoted to Rear Admiral in 1977 in the Naval Reserve. I was

employed as an engineer by the General Electric Co. between 1946 and 1958, and by the Bethlehem Steel

Co.'s Shipbuilding Division in 1949 and 1950. I held the positions of Director of Engineering at a major

shipbuilding company in Seattle, WA from 1969 to 1972 and of Vice President of Engineering in

Pascagoula, MS from 1972 to 1975. During all these periods I have maintained close contact with the U.S. Navy. During times of civilian employment, I have had periods of active duty in the Department of Defense [DOD], the Naval Sea Systems Command [NAVSEA] in Washington, D.C., and shipyards. My experience has caused me to be thoroughly familiar with U.S. Navy specifications by means of which the U.S. Navy controlled its contracts and inspection procedures, and thereby controlled its suppliers. Since my retirement in 1982 my specific knowledge of new procedures has decreased. I have been an independent consultant since 1975. I have personal knowledge of the facts herein.

2.    I submit this Affidavit in support of Foster Wheeler's Notice of Removal to attest to the levels of direction, control, and supervision exercised by the U.S. Navy over the design and manufacture of equipment, including boilers and their auxiliary equipment [collectively referred to as "boilers"] designed and constructed for installation on ships of the U.S. Navy.

3.    During my service in the U.S. Navy as a Ship Superintendent, I was personally involved with supervision and oversight of ship's overhauls and alterations. I was fully aware that only boilers especially designed and built for the propulsion of U.S. Navy combat vessels, including Foster Wheeler boilers, could be installed. These were designed and manufactured in accordance with detailed specifications written, approved, and issued by the U.S. Navy, specifically NAVSEA or its predecessors, including the Bureau of Engineering.

4.    The U.S. Navy chain of command concerning ship construction comprised several layers. The Secretary of the Navy [subject to the President and Congress] had the ultimate authority related to contractual and technical control. An Under Secretary was directly concerned with ship acquisitions. The Under Secretary position has now been eliminated, and that authority now rests with the Chief of Naval Operations who provides NAVSEA with the

desired ship characteristics, and oversees its performance. In the 1930s, Foster Wheeler, as a boiler and heat exchanger manufacturer, was under the cognizance of the Bureau of Engineering. The representative of that Bureau at the plant was an Inspector of Naval Machinery. The Bureau of Engineering and the Bureau of Construction and Repair were combined in 1940 to create the Bureau of Ships: for a time Approvals were required from both the Inspector of Machinery and the Supervisor of Shipbuilding for the lead ships of a class. Later, the Inspectors of Naval Machinery were renamed Inspectors of Naval Material. About 1958, the Bureau of Ordnance was merged with the Bureau of Ships to form NAVSEA. As a reduction in the pace of shipbuilding continued, routine inspection responsibilities were assumed by a new organization: the Defense Contract Administration Services Agency [DCASA]. This organization had many responsibilities, but lesser technical qualifications. Technical questions were referred to the Bureaus [Commands] in Washington. Throughout all of these reorganizations there were no changes in the ultimate authorities or the responsibilities of those authorities. Suppliers of equipment and the builders of ships have had the U.S. Navy's acceptance of their products determined by representatives of different organizations at different times but NAVSEA or its predecessors always had the ultimate authority and the professional competence to accept or reject them.

5.    Under NAVSEA, as under its predecessors, the U.S. Navy's shipbuilding and acquisition of equipment for the ships comprised several levels of authority. Detailed technical control over ship design, construction, repair, and inspection was in NAVSEA. The Commander of Naval Supply Systems Command [NAVSUP] had contractual control of some procurements. Each of these two organizations had oversight responsibilities regarding, among other things, boilers manufactured for U.S. Navy vessels. Compliance with the specifications and standards was directly monitored by Inspectors of Naval Machinery under both these divisions: those

under NAVSUP generally worked on site at the supplier's [in this case Foster Wheeler's] manufacturing facilities and Machinery Superintendents or Inspectors of Naval Machinery carried out their responsibilities at the shipbuilding yards. Moreover, it was common in my experience for technical personnel from the Propulsion Equipment Groups of NAVSEA to inspect the manufacturing and quality assurance processes at supplier's plants and the boiler erection and inspection procedures at the shipyards. In my experience, it was machinery inspectors who exercised primary, front line control over the work performed for the Navy by suppliers such as Foster Wheeler in the production of boilers and other equipment. The Inspectors of Naval Machinery [or those with other titles who succeeded them] were responsible for assuring that contractors such as Foster Wheeler complied with the contract specifications every detail. Further, the Inspectors of Naval Machinery would report to their superiors any violations of, or failures to comply with specifications, refuse to apply their stamp of approval, and not authorize shipment. This was true whether the installation was to be done by government shipyards or government contract shipyards.

     5.    The U.S. Navy retained the "final say" over the design of any piece of equipment, and made the ultimate decisions, whether engineering or contractual.

     6.    Further, I can attest that the military specifications for boilers and other equipment intended for use on vessels of the U.S. Navy, known as "MilSpecs", were drafted, approved, and maintained by the U.S. Navy, specifically NAVSEA or its predecessors, to encompass all aspects of shipboard equipment, including the material requirements.

     7.    These contract specifications reflected the state of the art and the special needs of vessels destined for combat. NAVSEA maintained and controlled the MilSpecs because it had direct contact with the forces afloat and the shipyards, and therefore superior knowledge of the

demands and requirements of vessels ready for combat, and the availability of processes and materials.

8. The U.S. Navy's unique specifications for boilers were communicated to boiler suppliers such as Foster Wheeler when the U.S. Navy, either directly or through its contractors, issued a negotiated contract or a Request for Proposal for equipment. The U.S. Navy specifications included the nature of any communication affixed to boilers or other equipment supplied to the U.S. Navy.

9. The U.S. Navy had complete control. It could not, and did not, permit its contractors to implement any changes. Every aspect of every item needed to be controlled because:

      a.    it had to be consistent with the ability of the crew to operate the ship, especially on its combat missions;

      b.    it had to be compatible with the ability of the crew to maintain the ship and perform emergency repairs during its service using materials and parts carried on board when shipyard assistance was not available;

      c.    every item had to be functionally compatible, fit in the space available, and be maintainable and operable with materials available from the U.S. Navy's supply system.

10. The U.S. Navy had complete control over every aspect of every piece of equipment. Military specifications governed every significant characteristic of the equipment used on U.S. Navy ships, including the instructions and warnings. Drawings for nameplates, the texts of instruction manuals, and every other document relating to construction, maintenance, and operation of the vessel was approved by the U.S. Navy. This control included the decision of which warnings should or should not be included. Thereby, the U.S. Navy controlled the decisions with regard to instructions and warnings on every piece of equipment. The U.S. Navy would not, and could not, permit any equipment manufacturer or supplier to interfere with the Navy's mission by placing warnings on any equipment [or in any instructions or manuals which accompanied the

equipment] on any U.S. Navy ships or in any shipyards in which U.S. Navy ships were built or repaired that might cause Sailors or workers to deviate from their mission or require the U.S. Navy to devote scarce resources to programs it deemed not essential, in its unilateral view.

11.    In addition to specifications for the design and manufacture of the equipment itself, the U.S. Navy also had detailed specifications that governed the form and content of the written materials to be delivered with the equipment, including boilers, supplied to the U.S. Navy. The U.S. Navy was intimately involved with and had final approval of all technical and engineering drawings, operating manuals, safety or hazard information and any other written information that accompanied or related to any piece of equipment. The U.S. Navy determined the nature of hazards to be subject to any precautionary labeling and the content of such labeling. In short, the U.S. Navy dictated every aspect of the design, manufacture, installation, overhaul, written documentation and warnings associated with its ships and did not permit deviation from any of its contractors.

12.    The U.S. Navy would never permit a supplier to suggest, advise, or require any actions that would be disruptive to the normal operation of the ship in its primary function of defending our Country. Procedures for operation were taught and enforced by officers of all ranks, from Petty Officers to Captains. Any written material regarding procedures for working around boilers that differed would have interfered with the normal and necessary operations of U.S. Navy ships. Indeed, in its specifications for manuals the U.S. Navy specifically limited warning information to items and events dealing with the operation of equipment. By definition, the application or removal of insulation would not have been included.

13.    Asbestos was rampant throughout U.S. Navy ships. Sailors and civilian personnel were exposed at all times when they were aboard ships regardless of where they were stationed or where they worked. In order to protect all these individuals from exposure to asbestos, the U.S.

Navy would have had to allocate scarce resources to provide respiratory protection for all sailors and workers every hour of every day that they were on board. Implementing wet down procedures and creating containment areas would also have been required to implement effective industrial hygiene programs. The U.S. Navy made a conscious decision on allocation of its resources in light of its knowledge of the hazards of asbestos and its mission to protect our Country. The U.S. Navy conducted extensive research concerning the hazard of exposure to asbestos starting in the 1930's. In the early 1940's, the Navy's Bureau of Medicine and Surgery, in coordination with the U.S. Maritime Commission, set standards based on the report of Dr. Drinker and Fleischer and Marr. Through its participation in government programs and conferences into the 1980's, the Navy stayed abreast of the latest information, including the results of research. The U.S. Navy made a conscious and informed decision about how asbestos would be used on its ships and how exposures would be controlled, if at all, on its ships.

14.     The U.S. Navy would not have allowed its equipment suppliers, such as Foster Wheeler, to affix any warning related to any asbestos hazards on their equipment. This would have included boilers. Further, the U.S. Navy would not have allowed Foster Wheeler to place any warnings related to asbestos hazards in any written material provided by Foster Wheeler to the U.S. Navy or to a U.S. Navy contractor in accordance with its contracts, including its technical and operations manuals. To do so would have interfered with the U.S. Navy's mission and control of its ships and personnel.

I declare under penalty of perjury that the foregoing is true and correct, and that if called as a witness, I could competently testify to the foregoing facts, all of which are within my own personal knowledge.

Ben J. Lehman, Rear Admiral, U.S. Navy, Ret.

Before me, the undersigned officer, personally appeared Ben J. Lehman, Rear Admiral, U.S. Navy, Ret. known to me to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal  acknowledge.

Executed this ___12th___ day of ___July___ 2007.

On this 12 day of 07, 2007, before me, a Notary Public,



___Josh Martin___

MY COMMISSION EXPIRES ___August 28, 2010___

JOSH MARTIN
NOTARY PUBLIC
STATE OF NEVADA
APPT. No. 06-108087-5
MY APPT. EXPIRES AUGUST 28, 2010

1

**cc: Via Hand Delivery**

2    Jeffrey A. Kaiser, Esq.
LEVIN SIMES KAISER & GORNICK, LLP

3    44 Montgomery St., 36th Floor
San Francisco, California 94104

4    (415) 646-7160
ATTORNEYS FOR PLAINTIFFS

5

6    All Known Defense Counsel (via regular mail)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

1

DEFENDANT FOSTER WHEELER LLC'S NOTICE OF REMOVAL